FILED
2013 NOV 12 A 11:22
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| THOMAS C. WETTACH, *Debtor* | : | Case Number 05-38188-TPA |
| | : | Chapter 7 |
| JEFFREY J. SIKIRICA, CHAPTER 7 TRUSTEE, *Plaintiff* | : | Adv. No. 07-2519 |
| v. | : | Related to Doc. Nos. 147, 150 |
| THOMAS C. WETTACH and BETTE C. WETTACH, *Defendants* | : | |

Appearances: John P. Vetica, Jr., Esq., for Plaintiff, Jeffrey J. Sikirica, Trustee and TrizecHahn Gateway, LLC
James Cooney, Esq., for Defendants, Thomas C. Wettach and Bette C. Wettach

# MEMORANDUM OPINION

The Court previously issued a *Memorandum Opinion*, Doc. No. 146, and a *Judgment Order*, Doc. No. 147 on March 26, 2013, resolving the case, for the most part, and entering judgment in favor of the Plaintiff in the amount of $428,868.12. There are, however, two remaining issues still to be dealt with before the *Judgment Order* can be considered final for purposes of appeal. First, the Court must determine whether contributions that the Debtor made to the Cohen & Grigsby ("C&G") Pension Plan ("the Plan") from 2002 through 2004 should be added to the amount of the judgment previously granted. Second, the Plaintiff[1] has filed a ***Motion to Assess Prejudgment Interest*** ("Motion") at Doc. No. 150 which requires resolution.

[1] In the prior *Memorandum Opinion*, the Plaintiff was referred to frequently as the "Trustee," in recognition of his status in the underlying bankruptcy. However, as will be seen below, much of the current discussion will concern the "Trustee" of the Plan, so in order to avoid any possibility of confusion the Court will exclusively use the designator of Plaintiff here to refer to Jeffrey J. Sikirica.

The two pending matters have been briefed and argued and are ripe for decision. For the reasons that follow, the Court finds that the contributions to the Plan are not property of the estate and hence will not be added to the judgment. The Court also finds that the *Motion* will be granted in part and prejudgment interest in the amount of $37,139.01 will be added to the judgment.

Although not strictly part of any open issue or pending motion, but prompted by a recent decision in a related case, the Court concludes by briefly touching upon the question of the proper "lookback" period in the case.

***(A) Plan Contributions***

Questions surrounding the Plan contributions, as well as gains realized by the Plan, were addressed in the *Memorandum Opinion* at pp. 46-55. The Plaintiff was seeking $155,000 in contributions to the Plan that were made by C&G for the benefit of the Debtor, as well as $49,503.28 in gains realized by the Plan. The Debtor claimed an exemption in the contributions and gains pursuant to *42 Pa. C.S.A. §8124(b)(1)(vii)*. The Plaintiff and TrizecHahn Gateway, LLC ("Trizec") filed objections to that exemption. Summarized below are the Court's prior holdings regarding these matters:

(1) The funds in question are not exempt pursuant to *42 Pa. C.S.A. §8124(b)(1)(vii)* because the Debtor was not a "retired employee" during the relevant period.

(2) Although the Debtor had not claimed any other specific ground for exemption, the Court considered on its own whether any other might apply and determined that *42*

*Pa.C.S.A §8124(b)(1)(ix)*, dealing with retirement funds that are "tax qualified" under the Internal Revenue Code, could potentially apply, but the Debtor had failed to show that the Plan enjoyed such tax qualification, so the funds are not exempt under that provision either.

(3) The Plaintiff could not recover any of the gain portion of the funds because he failed to meet his burden of proof to show they were derived from the contribution portion of his claim.

(4) The Plaintiff could make a recovery of the contribution portion of his claim, but only to the extent of $114,000 because only that amount was proven to have been made during the lookback period.

(5) Although the Debtor had not raised an alternative argument that his interest in the Plan was not property of the estate, the Court considered that possibility anyway and concluded that it was possible that it was not property of the estate pursuant to *11 U.S.C. §541(c)(2)*, but that the Debtor would first have to show the Plan was a trust and had an anti-alienation provision that is enforceable under Pennsylvania law.

It must also be noted that a significant evidentiary development has occurred since the *Memorandum Opinion* and *Judgment Order* were entered seven months ago. That development was the *Order* of August 30, 2013, entered upon the request of the Defendants and with the consent of the Plaintiff and Trizec, which opened the trial record in order to make the entire Plan document a part of the record, designated as Defendants' Post-trial Exhibit 1. Previously, the record had only included a few brief excerpts from the Plan document. That former absence of the complete Plan document from the record played a significant role in the holdings of the Court summarized at Items (2) and (5) in the above list.[2] Now that the entire Plan document is part of the record and available

[2] Items (1), (3) and (4) in the list are unaffected by the subsequent admission of the complete C&G Plan document and remain the Court's "final word" on those matters.

for consideration, fundamental fairness requires a fresh look at those items as may be necessary.

Turning first to the "property of the estate" question, Item 5, the Court previously held that there appeared to be insufficient evidence of record to show the funds in question were not property of the estate pursuant to *11 U.S.C. §541(c)(2)*, which provides:

> (2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

If the conditions of this statute are met, the effect would be to exclude the Debtors' interest from being property of the bankruptcy estate. *See, e.g., In re Laher*, 496 F.3d 279, 287 (3d Cir. 2007).

In so holding in the prior order, the Court found that the first required element for *Section 541(c)(2)* to apply had been shown, *i.e.*, the existence of a restriction on transfer, based on the ant-alienation provision found in §9.2(a) of the Plan, which was included in one of the excerpts from the Plan document that had been admitted into evidence at trial. The second and third elements, *i.e.*, existence of a trust and enforceability of the transfer restriction under applicable nonbankruptcy law, were, however, found not to have been shown.

With respect to the trust element, while there were a few suggestive references to "Trust" and "Trust Fund" in the Plan excerpts that were in evidence, they were insufficient to show the Plan included a trust. With respect to the enforceability element, the Court first noted that the required enforceability could either be derived via federal law (*Employee Retirement and Income Security Act*, or ERISA) or state law (spendthrift trust). *See Patterson v. Shumate*, 504 U.S. 753 (1992). The Plan excerpts admitted at trial did not establish enforceability under ERISA for the

same reason they did not establish tax qualification for purposes of exemption under *42 Pa. C.S.A. §8124(b)(1)(ix)*. The Court found that the alternative of enforceability under Pennsylvania law as a spendthrift trust was still possible, hence the tentative nature of the holding in Item 5, with provision made for subsequent argument. Now that the entire Plan document has been admitted into the evidentiary record, the Court must determine if it establishes either the trust or enforceability elements for purposes of *Section 541(c)(2)*.

***A. (1) Trust***

The Plan is to be construed and enforced in accordance with the Internal Revenue Code, ERISA and the laws of Pennsylvania. *See* Plan §9.3. Pennsylvania law must therefore be applied in determining whether the Plan is a trust for purposes of *Section 541(c)(2)*. *See In re Laher*, 496 F.3d at 288. Under Pennsylvania law, a trust is a fiduciary relationship under which one person holds property subject to an equitable obligation to hold or use that interest for the benefit of another. *Rebidas v. Murasko*, 450 Pa. Super. 546, 550 (1996). No particular form of words or conduct is necessary to create a trust; the question is whether the document taken as a whole evidences an intent to impose upon a transferee of property equitable duties to deal with the property for the benefit of another. *Buchanan v. Brentwood Fed. Sav. and Loan Ass'n*, 457 Pa. 135, 143-44 Pa (1974).

The Plan document is dated December 27, 2002, and provides that it is an amendment and restatement of a plan originally created effective April 1, 1985. Plan at 1. C&G had preserved the right to amend the earlier plan provided the "Trustee" joined in such an

amendment, which seems to indicate that a trust had previously been created, and a trustee appointed. The Plan document is replete with references to the "Trust," the "Trust Fund," and the "Trustee." *See, e.g., id.* at §§ 1.54 (definition of "Trustee"), 1.55 (definition of "Trust Fund"), 2.1(a) (employer's power to appoint "Trustee"), 2.8 (expenses of administration may be paid out of "Trust Fund"), 4.2 (employer to designate to the "Trustee" the plan year for which contributions are made), 5.1 ("Trustee" to determine value of "Trust Fund" as of valuation date), 6.1 ("Trustee" to distribute benefits to participant upon retirement), and 9.2 (anti-alienation provision for "Trust Fund"). Many other such references could be cited. While the mere presence of this terminology is not sufficient to establish that the Plan is a trust for purposes of *Section 541(c)(2), see, e.g.*, *Buchannan, supra*, it is entitled to some weight.

Furthermore, the overall structure of the Plan document leads the Court to believe that a trust is exactly what was intended. A transferor is identified, that being G&G which is required to make annual contributions to the Plan. *Id.* at §4.1. Once made, those contributions are irrevocable. The Plan prohibits any amendment which would authorize a reversion of any contributions to C&G, *Id.* at § 7.1 (b)), and provides that upon termination, all funds being held are to be distributed to Plan participants *Id.* at §7.2. The Plan is to be "operated for the exclusive benefit of the Participants and their Beneficiaries." *See, e.g., Id.* at §2.1 (a). The distribution of benefits upon a participant's retirement, death, permanent disability, or termination from employment by C&G is provided in Article 6 of the Plan. All of this is consistent with a trust.

On the other hand, it is also true that the Plan document does not specifically identify <u>who</u> the "Trustee" is, and the Court is not aware of any other evidence that was presented from

which that information could be obtained. While this lack of knowledge of the Trustee is less than ideal, it does not undo the finding of the existence of a trust. *See, e.g., Rebidas, supra* (statement will be sufficient evidence of trust if beneficiary, trust property, and trust's purposes are set forth therein), *Restatement (Third) Trusts*, *§31* (2003) (a trust does not fail because no trustee is designated unless the trust's creation or continuation depends on a specific person serving as trustee). The Plan document also does not explicitly provide that the Trustee is to hold legal title to Plan contributions, but that is certainly implicit in the document given the various duties of the Trustee. *See also*, *Restatement (Third) Trusts* at *§42, comment b* (unless the transferor manifests a different intention, the trustee takes the settlor's full title or interest in the transferred property).

The Court thus finds that, with the introduction of the complete Plan document into evidence, the Debtor has now met his burden of proving that the Plan constitutes a trust for purposes of *Section 541(c)(2)*.

### ***A. (2) Enforceability***

As indicated above, the Court had previously found that the Debtor failed to show that the transfer restriction in the Plan was enforceable under federal law, while leaving the other option of enforceability under state law still an open question. With the subsequent admission of the complete Plan document, the Court will reconsider its holding as to federal law.

To recapitulate and set the table a bit, in *Patterson, supra*, the Supreme Court construed the phrase "applicable nonbankruptcy law" in *Section 541(c)(2)* to encompass any relevant nonbankruptcy law, including federal law. The *Patterson* court further noted that to be qualified

under ERISA, a pension plan must include an anti-alienation provision. *See 29 U.S.C. §1056(d)(1)*. Such anti-alienation provision is tantamount to a "restriction on the transfer of a beneficial interest of the debtor" as provided in *Section 541(c)(2)*, and moreover it is enforceable because ERISA gives participants the right to sue to enjoin acts that violate the statute or a plan's terms.

The net result of *Patterson* for present purposes is that if the Plan is ERISA-qualified, the enforceability element of *Section 541(c)(2)* will have been met. The best evidence to show ERISA-qualification would have been a certification by the Internal Revenue Service or the Department of Labor to that effect, or the testimony of someone with personal knowledge, but unfortunately no such evidence was presented. Despite that evidentiary shortcoming, having now reviewed the entire Plan document, the Court is of the view that the evidence does nevertheless preponderantly demonstrate the Plan to be ERISA-qualified. *See, e.g., In re Hanes*, 162 B.R. 733 (Bankr. E.D. WI 1994) (finding sufficient evidence to establish plan's qualified status even though issue was not entirely free from doubt).

In so concluding, the Court notes that there are a number of provisions in the Plan document that make clear it was established and is to be carried out in accordance with ERISA requirements. There are repeated references to provisions within the Internal Revenue Code that are used as definitions or instructions for purposes of the Plan. For just a few examples, *see* §§ 1.15, 1.22, 1.23, 1.28, 6.11(b), and 8.1. In §2.1(a), C&G is given the power to remove the Trustee and Administrator as it deems necessary to ensure that the Plan is being operated in accordance with the terms of the "Act," defined elsewhere in the document to mean ERISA. *See* §1.1. The Plan Administrator is given the duty to maintain compliance with "Act Section 404(c)" (ERISA provision

dealing with plans that permit participants to exercise control over plan assets in certain respects by giving investment instructions). §4.6(a) of the Plan provides that "[w]ith the consent of the Administrator, amounts may be transferred "within the meaning of [Internal Revenue] Code Section 414(l)) to this Plan from other tax qualified plans ...," clearly implying that the Plan is itself tax qualified. The Plan may also accept a "rollover" by participants, provided such "will not jeopardize the tax exempt status of the Plan." §4.6(b).

The anti-alienation provision itself makes clear it is being included in the Plan to the extent permitted by ERISA. §9.2(a). Finally, and perhaps most significantly, is a provision that explicitly states that if the IRS ever finally determines that the Plan does not initially qualify as a tax exempt plan under Internal Revenue Code Sections 401 and 501, then if it is a new plan it will be void *ab initio*, and if it is an amended plan, it will operate as if it had not been amended. *See* §9.13, entitled "Approval by Internal Revenue Service." The evidence that the Plan functioned before, during, and after the lookback period is thus strong evidence that it was ERISA-qualified at all relevant times.

### *A. (3) Summary as to Plan Contribution Issue*

The Court thus concludes that the Debtor has now met his burden of proof with respect to all of the required elements under *Section 541(c)(2)* and demonstrated that the funds being held in the Plan for his benefit are not property of the estate, and hence are not within the jurisdiction of this Court and may not be recovered by the Plaintiff. In light of that conclusion, the Court need not consider the alternative question of whether the Plan transfer restriction is also

enforceable under Pennsylvania spendthrift trust law. Additionally, the question of whether the Plan funds are exempt under §*42 Pa.C.S.A §8124(b)(1)(ix)* in light of the admission of the complete Plan document into the record is now moot and need not be addressed.

### *B. Prejudgment Interest*

In the *Motion*, the Plaintiff asks that prejudgment interest be assessed from the date the adversary was filed (October 15, 2007) until the date of the *Judgment Order* (March 26, 2013). Using the federal rate of interest as provided in *28 U.S.C. §1961*, which he asserts would be 4.24%,[3] the Plaintiff calculates this interest at $98,963.93. The Plaintiff concedes that he has no right to the relief requested because any award of prejudgment interest in this matter would be discretionary with the Court, though he argues that the exercise of discretion should be "tempered" in his favor.

The Defendants respond by arguing that the Plaintiff was pursuing only state law causes of action in this case. They say that Pennsylvania law is clear that prejudgment interest may not be awarded in a tort action where the damages sought to be recovered were unliquidated. Even if federal law is found to apply, Defendants urge that any award of prejudgment interest would be discretionary with the Court and argue that since they are not responsible for the long period of delay in the case it would be unfair to punish them by requiring them to pay prejudgment interest.

The Defendants are correct that the Plaintiff proceeded solely under Pennsylvania law in this mater, that being three counts under the *Pennsylvania Uniform Fraudulent Transfer Act*

---

[3] 4.24% was the 1-year constant maturity treasury yield as published by the Board of Governors for the Federal Reserve System for the week ending October 12, 2007.

("PUFTA"), *12 Pa. C.S. §§5101, et. seq*. As such, the cases cited by the Plaintiff in his brief in support of the *Motion* are of limited value here because they all involve cases in which the underlying action was being pursued in a bankruptcy-created cause of action under Chapter 5, Subchapter III of the Bankruptcy Code, *11 U.S.C. §§541, et. seq*. The Court therefore agrees with the Defendants that it is more appropriate to look to Pennsylvania law for guidance on whether prejudgment interest should be awarded in this case since the case was based on Pennsylvania law.

The Defendants appear to be incorrect, however, in their contention that Pennsylvania law would flat-out prohibit the award of any prejudgment interest in this case because it was a 'tort action" where the damages were unliquidated. In the first place, while the case was clearly not a contract action, neither can it be said to have been a purely tort action since it was based on a statutory claim.[4] Secondly, it may not be accurate to characterize the damages as completely unliquidated. Third, and in any event, it is not clear that the contract/tort, liquidated/unliquidated dichotomies for whether prejudgment interest can be awarded under Pennsylvania law, as espoused by the Defendants, is completely accurate. For instance, in one case the court stated:

> It is well settled that in contract cases, pre-judgment interest is awardable as of right. Fina v. Fina, 737 A.2d 760, 770 Musko v. Musko, 714 A.2d 1076, 1077 (Pa.Super.1998). Because the instant matter is not in the nature of contract, Old Republic contends that pre-judgment interest is an unavailable remedy. We cannot agree. "Our courts have generally regarded the award of prejudgment interest as not only a legal right, but also as an equitable remedy awarded to an injured party at the discretion of the trial court." Somerset Community Hospital v. Allan B. Mitchell & Associates, 454 Pa.Super. 188, 685 A.2d 141, 148 (PA 1996) .... While the general rule is that a successful litigant is entitled to interest beginning only on the date

[4] The Court notes that *PUFTA* provides for a four-year statute of limitations. *See 12 Pa.C.S. §5109.* To the extent relevant, this corresponds to general Pennsylvania law as to breach of contract actions rather than the shorter two-year statute for tort claims. *Compare 42 Pa.C.S. §§5524, 5525.*

> of the verdict, it is nonetheless clear that pre-judgment interest may be awarded "when a defendant holds money or property which belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment." Dasher v. Dasher, 374 Pa.Super. 96, 542 A.2d 164, 164-65 (1988) (quoting Sack v. Feinman, 489 Pa. 152, 164, 413 A.2d 1059, 1065 (1980)). Pre-judgment interest in such cases is a part of the restitution necessary to avoid injustice.

*Kaiser v. Old Republic Ins. Co.*, 741 A.2d 748, 755 (Pa. Super. Ct. 1999). The Court here has little difficulty analogizing the fraudulent transfer claims against the Defendants to an unjust enrichment situation in that the essential allegation is that the Defendants were holding or had used money that rightfully belonged to the bankruptcy estate. Finally, the Court has located at least one case in which prejudgment interest was awarded in a case under PUFTA. *See Tiab Commc'ns Corp. v. Keymarket of Nepa, Inc.,* 263 F. Supp. 2d 925, 947-49 (M.D. Pa. 2003).

For the above reasons, the Court concludes that it has the discretion to award prejudgment interest, even under Pennsylvania law. The Court will follow the lead of *Tiab*, *supra*, and be guided in its consideration by four factors:

> (1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether countervailing equitable considerations militate against a surcharge.

263 F.Supp. 2d at 947 (citing *Feather v. United Mine Workers*, 711 F.2d 530 (3d Cir. 1983).

The first factor is of limited relevance in this case since there is little evidence one way or the other as to the diligence of the Plaintiff in prosecuting the action. The Defendants make the contention that the action has been delayed due to excessive settlement demands by the Plaintiff, but there is no evidence to support that and the Court does not credit it. The second and third factors do support an award of prejudgment interest. The Defendants have been "unjustly enriched" in the

sense that they have had the use of funds for many years that rightfully belonged to the bankruptcy estate of which the Plaintiff is the representative. Furthermore, an award of prejudgment interest would be compensatory in that it would account for the time value of the money which by right should have been part of the bankruptcy estate and available for distribution to creditors.

The fourth factor weighs against an award of prejudgment interest. In fact, there are a number of equitable considerations militating against such an award. First, the case has been delayed through no fault of either side by the unexpected death of one judge and the retirement of another after he had tried the case but before he had rendered a decision. Each time a factually intense case such as the present one is reassigned to a new judge there is inevitably going to be delay while the new judge becomes acquainted with the case and the issues presented. It is, of course, impossible to determine exactly how much time the judicial reassignments added to the time for ultimate resolution of the case, but the Court has little difficulty concluding that at least two years of delay is attributable to those events.

An additional two month delay in the case was caused by the unsuccessful, but good faith effort at mediation that the Parties engaged in from October through December 2012. A third reason for delay that cannot be laid at the feet of the Parties relates to the fact that the Plaintiff or other bankruptcy trustees were simultaneously pursuing similar cases against other former partners of Titus and McConomy. The Court strongly suspects that the original judge who was handling all of those cases was proceeding with them in somewhat of a lockstep fashion, perhaps hoping that they could all be resolved as a group. This is indicated by the numerous continuances that were ordered during that stage of the case. *See, e.g.*, Doc Nos. 14, 42, 70 and 74. *See also* Doc. No. 23,

an "Amicus Curiae Brief" filed in a number of the "Titus" cases concerning common issues. The Court concludes that his factor alone added at least a year to the time to resolve the case.

It would be inequitable to award any prejudgment interest for the additional time in the case that was caused by the situation with the judges, the time spent in mediation, and the group nature of filings against the Debtor and his former partner. An additional equitable factor that the Court finds weighing against an award of prejudgment interest is the lack of any actual fraudulent intent on the part of the Defendants and the somewhat unsettled state of the law during the lookback period on whether the transactions in question constituted fraudulent transfers.

As can be seen, overall the four factors are closely balanced. In these circumstances, the Court finds that the most appropriate approach is to award prejudgment interest, but for equitable reasons to exclude from the computation those periods of delay in the case as identified above that were in no sense the fault of the Defendants. The Court estimates this period to be roughly 38 months, which for computational purposes will be added to the filing date so as to reduce the amount of prejudgment interest awarded. When that is done, and rounded off, it results in a start date of December 26, 2010 for the computation of prejudgment interest. The result is 28 months of prejudgment interest, which at 4.24% computed daily and compounded yearly[5] works out to $37, 139.01.

[5] The Defendants did not dispute either the proposed interest rate put forward by the Plaintiff, or the proposed method of calculation.

***C. Lookback Period***

Since the *Memorandum Opinion* and *Judgment Order* were issued in March of this year, appellate case law developments have occurred in several of the related cases. *See Cardiello v. Arbogast*, – Fed. Appx. – , 2013 WL 4007772 (3d Cir. Aug. 7, 2013), and *Titus v. Shearer*, Civil Nos. 12-1559 and 12-1560 (W.D. Pa., Sept. 30, 2013) (also reproduced at Doc. Nos. 113 and 115 in Adv. No. 10-2338-TPA). Overall, the Court believes that its application of the law in the present case is consistent with the holdings in those two appellate level cases where there are overlapping points. However, the two cases do raise an issue about the proper length of the lookback period under *PUFTA* that could possibly be implicated here. In light of the fact that the Judgment Order is not yet final and can be changed, the Court will take advantage of that prospect and look to see if the current holding as to lookback period is, correct as is, or needs to be changed to comply with the new developments.

In the *Arbogast* case, the Chapter 7 trustee argued that the bankruptcy court had erred in limiting her recovery to fraudulent transfers occurring in the four year period prior to the April 23, 2007 initiation date of the fraudulent action in state court[6] based on its interpretation of the relevant *PUFTA* limitations provision, *12 Pa. C.S.A. §5109*. The trustee asserted that the proper interpretation of that statute would also allow for the recovery of fraudulent transfers occurring after April 23, 2007. The Third Circuit found that the trustee's position might have "theoretical merit," but it did not reach the merits of the argument by finding that the trustee had waived the argument

---

[6] In Arbogast the fraudulent transfer action was filed in state court before any bankruptcy petition had been filed. After the petition was filed, the fraudulent transfer case was removed to the bankruptcy court. By contrast, in the present case the fraudulent transfer action was initiated in this Court after the petition was filed.

by agreeing at a pretrial conference that the relevant time period was limited to four years. *See* 2013 WL 4007772 at *4.

In the very recent *Titus* case, Chief Judge Joy F. Conti of the District Court did reach the merits of that same argument and concluded that:

> Nothing in the statute or case law suggests that recovery is only permitted for transfers prior to the filing of a fraudulent transfer complaint. The bankruptcy court therefore erred in limiting the recovery period to April 23, 2003–April 23, 2007. The Trustee, however, may have waived his claims to transfers in the period after the complaint was filed. While Trizec included a claim for injunctive relief in the complaint, neither Trizec nor the Trustee moved for a preliminary injunction. On the other hand, the Rituses were aware that these transfers were at issue, yet they continued to have Mr. Titus's wages directly deposited into the entireties account. The record on this issue is not complete. On remand, the bankruptcy court should consider "applicable principles of equity," 12 Pa. Cons. Stat. § 5107(a)(3), and decide whether the Trustee may recover constructively fraudulent transfers from April 23, 2007, to May 28, 2010.

The Court had previously been of the view that the Plaintiff did not contest that the applicable lookback period in the present case was only from October 14, 2001 through October 14, 2005. However, in light of Judge Conti's decision in *Titus*, as a precautionary measure the Court must determine if in fact the Plaintiff has ever made a sufficient claim for a recovery period extending beyond October 14, 2005, and if so whether such claim has been preserved. Looking first at the pleadings, the Court finds that the Plaintiff did include in his prayer for relief a request for an injunction to restrain future transfers. However, the Plaintiff did nothing to actually pursue a preliminary or permanent injunction during the litigation.

Moreover, after reviewing the record of the case, the Court can find nothing to indicate that the Plaintiff ever argued that he should be able to recover fraudulent transfers occurring after October 14, 2005. The evidence presented by the Plaintiff at trial concerning fraudulent transfers was limited to the 2001 through 2005 time period. During his questioning of the Debtor at trial concerning a Merrill Lynch investment account, Counsel for Plaintiff stated:

> Q: Okay. Have you made contributions to this account since 2001 ***in the period that we're looking at this morning, 2001 through 2005***?

Trial Tr. at 51:6-8, Doc. No. 126 (emphasis added). *See also* Plaintiff's Post-trial Brief at 5, Doc. No. 116 (stating that Plaintiff was challenging retirement fund contributions made from 2001 through 2005).

The Court finds that although the Plaintiff may have effectively made an initial claim for recovery of post-October 14, 2005, fraudulent transfers in his complaint, by his subsequent words, conduct, and inaction he has at least implicitly waived or abandoned any claim for a recovery beyond that date, and in any event has failed to meet his burden of proof with regard to any such transfers. Furthermore, to the extent that any technical requirements for a waiver might be found missing here, the Court would find in the alternative that principles of fairness would not permit the Plaintiff to make a recovery for any transfers occurring beyond October 14, 2005. The Plaintiff led Defendants to believe that only prior transfers were at issue and tried the case accordingly. *See, e.g., Universal Tankships, Inc. v. U.S.,* 528 F.2d 73, 76 (3d Cir. 1975) (consideration of argument not

raised at trial would be prejudicial to opposing side which might have tried case differently if made aware of same).

An appropriate order follows.

Dated: November 12, 2013

Thomas P. Agresti, Judge
United States Bankruptcy Court

Case Administrator to serve:
John Vetica, Esq.
James Cooney, Esq.
Debtor
Neil Levin, Esq.